IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CATHERINE MARGARET BUECHNER,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION AND ORDER |
| v. |  | 20-cv-379-wmc |
| ANDREW SAUL, Commissioner of Social Security, |  |  |
|  | Defendant. |  |

In this case, plaintiff Catherine Margaret Buechner seeks judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income.   While not all of plaintiff's arguments are persuasive, the court agrees that Administrative Law Judge ("ALJ") Virginia Ferrer committed a number of errors in her assessment of Buchner's alleged disability. Accordingly, the case will be remanded for reconsideration.

BACKGROUND

**A. Work History**

Prior to her alleged onset date of September 1, 2014, Buechner worked as a web designer from August 2009 through August 2014.   After that date, she continued to periodically work as a web designer; however, her earnings did not rise to the level of substantial gainful activity.

### B. Medical Record[1]

#### 1. Mental Limitations

As discussed below, Buechner's medical records reflect a history of depression and anxiety for which she consistently received treatment during the relevant period. In addition, Buechner regularly reported cognitive concerns to her treatment providers, particularly regarding her memory and attention span. During the relevant period, and as it relates to her depression and mental limitations, Buechner was regularly seen and treated by Dr. Kimberly Haycraft-Williams, M.D, her primary care physician ("PCP"), Patricia McGown, a therapist, and Nurse Miriam Sward, APNP. She would also receive periodic psychological and cognitive evaluations from specialists.

In particular, between September 2015 and December 2016, Buechner had monthly appointments with Dr. Haycraft-Williams. (*See* AR 436-449, 504-05, 641-53, 684-97, 708-50.) At nearly all of these appointments, Buechner's depression and anxiety were discussed, and she was regularly asked to complete the PHQ-9[2] depression diagnostic questionnaire, which most frequently indicated a "moderately severe" level of depression anxiety. (*See* AR at 434 (September 2015, PHQ-9 score of 18); AR at 442 (November 2015, PHQ-9 score of 14); AR at 446 (December 2015, PHQ-9 score of 20); AR at 708 (January 2016, PHQ-9 of 19); AR at 697 (February 2016, PHQ-9 score of 18); AR at 684

---

[1] Because plaintiff's appeal relates to plaintiff's mental and sitting limitations, the following discussion of the medical record focuses on facts relevant to those limitations.

[2] The Patient Health Questionnaire (PHQ)-9 is a self-administered diagnostic instrument to measure depression severity. Kurt Kroenke, Robert L. Spitzer, & Janet B.W. Williams, *The PHQ-9*, J. Gen. Internal Med. (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/. A score of 0-4 represents a "minimal" level of depression severity; 5-9, mild; 10-14, moderate; 15-19, moderately severe; and 20-27, severe. *Id.*

(March 2016, PHQ-9 of 19); AR at 654 (June 2016, PHQ-9 score of 17); AR at 650 (June 2016, PHQ-9 score of 14); AR at 641 (August 2016, PHQ-9 score of 16); AR at 737 (September 2016, PHQ-9 score of 16); AR at 720 (October 2016, PHQ-9 score of 18).) Buechner's concerns about her cognitive abilities were also sometimes discussed with Dr. Haycraft-Williams.   For example, in June of 2016, Buechner expressed concern over "worsening cognitive difficulties" (AR at 653), and in July of 2016, she again discussed her "cognitive problems" (AR at 750).   During these appointments, Buechner sometimes reported that her mental impairments made it difficult for her to do work as well.  (*See, e.g.*, AR at 641 (representing that her depression symptoms made it "very difficult" to "do [her] work, take care of things at home, or get along with people"); AR 442 (expressing that she felt she did not have energy to return to work yet).)

As noted, to treat these mental conditions, Dr. Haycraft-Williams prescribed medication and would refer Buechner out for various evaluations, including a neuropsychological evaluation and a psychiatric consult.  (*See* AR at 653, 750.)  Still, on those occasions when Dr. Haycraft-Williams made note of her own observations regarding Buechner's mental health symptoms -- such as judgment, insight, and orientation to person, place, and time -- she generally concluded that Buechner's status was normal or intact.  (*See, e.g.*, AR at 446, 737, 715.)  Moreover, Dr. Haycraft-Williams largely did not note any mental abnormalities based on her own observations of Buechner's behavior; instead, she mostly noted the problems that Buechner relayed to her.

Therapist Patricia McGown, MS, LPC, RYT, also regularly saw Buechner for counseling appointments between November of 2015 and April of 2017.  (AR at 877-936.)

During these appointments, Buechner typically discussed her depression, anxiety, and related mood problems.  (*See* AR at 877-936.)   Buechner would similarly frequently mention cognitive concerns.  For example, on December 10, 2015, Buechner described experiencing "'cotton balls for memory' 3 to 4 days per week."  (AR at 885.)  And in April of 2016, she reported that "her short term memory was 'shot' and she struggled to recall questions or things she had stated."  (AR at 896.)  As with Dr. Haycraft-Williams, however, McGown herself observed generally normal cognitive focus during sessions with Buechner (*see, e.g.*, AR at 900, 901, 903, 906), although at times, McGown noted her difficulty focusing on one topic (*see, e.g.*, AR at 898).  Finally, more than once, Buechner mentioned that she was attempting to get a "60 month disability," which she said would forgive all her student loans.  (*See* AR at 888, 898.)

The third clinician who regularly saw Buechner for her depression and mental concerns was Nurse Miriam Sward, APNP, who saw Buechner for "Behavioral Health" appointments in 2016 and 2017.  (AR at 874-986, 1107-36, 1144-.)  Like Dr. Haycraft-Williams, Nurse Sward recorded Buechner's PHQ-9 diagnostic score during these appointments, which generally reflected moderately-severe or moderate levels of depression.  (*See* AR at 874 (December 2016, PHQ-9 score of 16); AR at 870 (January 2017, PHQ-9 score of 12); AR at 1126 (June 2017, PHQ-9 score of 15); AR at 1115 (September 2017, PHQ-9 score of 13).)   Nurse Sward also employed the GAD-7[3]

---

[3] Like the PHQ-9, the Generalized Anxiety Disorder ("GAD")-7 is a self-administered diagnostic instrument to measure anxiety severity.  Robert L. Spitzer, et al., *A Brief Measure for Assessing Generalized Anxiety Disorder: The GAD-7*, Arch Intern Med. (2006), https://www.researchgate.net/publication/7064924.  A score of 0-4 represents a "minimal" level of anxiety; 5-9, "mild"; 10-14, "moderate"; and 5-21, "severe." *Id.* at 1095.

diagnostic tool for anxiety, which reflected moderate levels of anxiety.  (*See* AR at 870 (January 2017, GAD-7 score of 11); AR at 1129 (June 2017, GAD-7 score of 14); AR at 1115 (September 2017, GAD-7 score of 13).)  Once again, although these notes reflect Buechner's own concerns regarding her cognitive dysfunction, (*see, e.g.*, AR at 873, 1114), Nurse Sward herself generally noted Buechner's mental status to be normal or intact, including memory, thought processes, and judgment.  (*See, e.g.*, AR at 870, 867, 1128, 1115.)  In particular, Nurse Sward wrote in June of 2017 that she was "inclined to believe that some of [Buechner's] issues may be secondary to a personality disorder, but further evaluation is certainly warranted."  (AR at 1129.)  She further noted that Buechner was "working forwards [applying for] disability" but that she believed that Buechner "would benefit from having employment.  She is very focused on finding reasons why she cannot work instead of figuring how she can work."  (AR at 1129.)

On November 17, 2015, and January 14, 2016, Ryan Stepp, Psy, D., also met with Buechner to address her concerns related to her cognitive and emotional functioning.  (AR at 405, 454-57.)  On March 15, 2016, he completed a written psychological evaluation of Buechner.  (AR at 405.)  In addition to interviewing Buechner, Dr. Stepp reviewed her treatment records from Vantage Point Clinic and Assessment Center and conducted various cognitive and behavioral tests.  (AR at 405.)  Dr. Stepp concluded that:

> [t]he results of the present assessment do not support the notion that Ms. Buechner is currently experiencing any sort of abnormal cognitive or memory functioning.  She completed measures designed to screen for impairments in memory and cognition.  No impairments were noted. . . .  Ms. Buechner also completed a series of tests to measure her social and emotional functioning.  Ms. Buechner tended to report a high number of symptoms on these tests. . . .  The results of the test also

> support the notion that Ms. Buechner tends to experience her
> anxiety through bodily symptoms.

(AR at 410.)  Dr. Stepp also noted that the results of the tests should be "interpreted with caution," due to her "tendency to overreport symptoms and potential to magnify problems."  (AR at 409.)  Nevertheless, Dr. Stepp diagnosed Buechner with "major depressive disorder, recurrent episode, severe," "generalized anxiety disorder," and "somatic symptom disorder, moderate."  (AR at 410.)

Dr. Stepp then referred Buechner to Dr. Jason Kanz, Ph.D (board certified in clinical neuropsychology) for a mental status examination that was conducted on May 23, 2016.  (AR at 834.)  In reviewing Dr. Stepp's records, Dr. Kanz noted that Buechner received an above-average score on the Wechsler Abbreviated Scale of Intelligence-II, which caused him to be "actually a bit surprised with how poor [her BCSE cognitive screening inventory] score was in someone of her background."  (AR at 834.)  Buechner shared with Dr. Kanz as well her concerns regarding cognition, forgetting details, repeating herself, word finding and vocabulary issues, and diminished processing speed, so much so that she "finds it almost impossible to do any computer coding at this point," and she could not work because of an inability to "stay focused well enough."  (AR at 834-35.)

On her mental status examination, which Dr. Kanz noted was "simply a screening inventory," Buechner scored generally normal results, except for memory (19/27), leading him to conclude that "[t]his seems to be primarily a memory related issue."  (AR at 835.)  Dr. Kanz further wrote that Buechner "had notably more word finding difficulties than I would have anticipated with intermittent paraphasic errors in speech."  (AR at 835.)  In his assessment, Dr. Kanz expressed "concern[] about what appear[s] to be pathognomonic

6

signs," again noting her word finding difficulties, and resolving to "look into this more closely to see if there is evidence of a formal cognitive disorder."  (AR at 835.)

Dr. Kanz had a follow-up appointment with Buechner on August 15, 2016, during which he administered a variety of tests and observed that she "put forth good effort."  (AR at 828-29.)  Buechner scored average or above average on most of these tests, including indexes on verbal comprehension, perceptual reasoning, and working memory.  (AR at 829.)  However, the processing speed index was in the 18th percentile, and her overall memory for short story details was "low average," putting her in the 14th percentile.  (AR at 829.)  As for her mood, Dr. Kanz noted that Buechner reported symptoms that were "somewhat atypical in clinical populations," including "significant depression," feelings of hopelessness, concern about her physical functioning, and anxiety.  (AR at 830.)  Ultimately, Dr. Kanz diagnosed Buechner with "cognitive dysfunction, presumed secondary to emotional factors," and concluded:

> Based upon this evaluation, it appears that there is evidence of deficit in verbal and nonverbal memory, aspects of attention and executive functioning relative to premorbid abilities in the above average range despite her concerns about "noun cancer" she actually has a fairly well developed vocabulary.  She does show some diminished processing speed, however, which I suspect is what she is noticing.  Looking at all of the information that is available to me, I suspect that these cognitive deficits are secondary to depression and anxiety.

(AR at 830.)

On July 19, 2016, Buechner next met with Dr. Gurdesh Bedi, M.D., for a consultation regarding her "difficulty with memory and other cognitive deficits."  (AR at 518.)  Specifically, Buchner reported that she:  (1) has difficulty misinterpreting words

when people are talking to her; (2) has difficulty with word finding and vocabulary; (3) experiences short term memory loss and forgets conversations with other people; (4) has depression and anxiety, resulting in difficulty sleeping or sleeping too much; and (5) has episodes in which she smells objects that are not around.  (AR at 522.)  Still, Dr. Bedi noted normal findings in his neurological examination, including a 30 out of 30 score on a "formal mini mental examination."  (AR at 522-23.)  Dr. Bedi recommended an MRI and EEG to assess her reports of abnormal smells, as well as a follow-up with a neuropsychologist to address her other concerns.  (AR at 523.)

On October 18, 2016, Buechner followed-up with Dr. Bedi to discuss the results of her MRI and EEG.  (AR at 516.)  Dr. Bedi explained that "her MRI was largely unremarkable, and her EEG did not show any evidence of epileptogenicity."  (AR at 516.)  According to Dr. Bedi, "her pattern of cognitive loss is more compatible with pseudodementia that would be related to depression, anxiety and PTSD."  (AR at 516.)  Moreover, Buechner again scored 30 out of 30 on the "mini mental status examination" at this appointment.  (AR at 516.)

On May 22, 2017, Buechner met with Dr. Farzana Quraishi, M.D., to discuss her chronic pain.  (AR at 1284.)  At the appointment, Dr. Quarishi noted that Buechner's "depression seems chronically uncontrolled.  This could be [a] major part in making her pain symptoms exaggerated.  But patient doesn['t] agree with this fact."  (AR at 1285.)

In the summer and fall of 2017, Dr. Kanz again saw Buechner for a diagnostic evaluation and follow-up regarding her cognitive concerns.  (AR at 1117-22.)  His 2017 tests revealed similar findings as the 2016 ones.  (*See* AR at 1118-20.)  Again, Dr. Kanz

noted no concerns about "poor effort" or "symptom magnification." (AR at 1118.) In his summary and impressions, he wrote that the recent testing "does not reveal any remarkable change in functioning. Her overall abilities remain within the average range. She does continue to show some subtle attentional and executive functioning difficulties." (AR at 1119.) However, Katz opined that "[c]linically, her score suggest[s] significant depression." (AR at 1119.)

On November 10, 2017, Dr. Amy Muminovic, D.O. -- who would become Buechner's PCP in mid-2017 (AR at 1044) -- completed a disability application in which she wrote that Buechner's Global Assessment Function Score was 35 (AR at 1236).[4]

State agency experts Esther Lefevre, Ph.D., and Stephen Kleinman, M.D., reviewed Buechner's medical record and rendered their opinions on July 18 and December 20, 2017, respectively. (AR at 94-95, 143-44.) Dr. Lefervre concluded that Buechner had no limitations in understanding, remembering, or applying information; mild limitations in interacting with others; no limitations in concentrating, persisting, o maintaining pace; and mild limitations in adapting or managing herself. (AR at 94-95.) On reconsideration, Dr. Kleinman concluded that Buechner had mild limitations in all four functional areas. (AR at 143-44.)

---

[4] The Global Assessment of Functioning Scale is a numeric scale included in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") IV to rate the psychological, social, and occupational functioning of an individual. *See Global Assessment of Functioning*, Wikipedia (last accessed                                Jan.                        29,                        2021), https://en.wikipedia.org/wiki/Global_Assessment_of_Functioning#cite_note-1. A score between 31 and 40, as Buchner's was here, indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*

### 2.  Sitting Limitations

In addition to her mental impairments, the medical record shows that Buechner had a number of physical impairments that could reasonably be expected to cause limitations in sitting.  Buechner had injured her back when she was still a child, and the medical records show that this historical injury continued to cause her pain and other concerns after her alleged onset date.  (*See* AR at 1284.)  In particular, Buechner periodically complained of lumbrosacral pain, as well as pain, tingling, and numbness in her legs.  (AR at 960, 950, 1334.)  Examinations revealed tenderness over the sacroiliac joint, lumbrosacral, and upper gluteal region.  (AR at 961, 1285.)  Buechner received sacroiliac joint injections to treat back impairments. (*See* AR at 954, 957, 1052-56, 938, 941, 944, 1095, 1099, 1256-58.)  In April of 2016, a lumbar spine MRA showed progressive degenerative disc disease, with persistent left sided disc protrusion which narrows the left lateral recess and posteriorly displaces the traversing left L5 nerve root, as well as overall stable degenerative disc disease at L3-4 and L5-S1.  (AR at 678.)  In November of 2017, Dr. Muminovic further opined that Buechner was unable to sit for long periods of time. (AR 1236.)  Finally, Buechner's BMI levels were over 50 during the relevant period.  (AR at 1269, 1288, 1342.)

At the same time, Buechner exhibited normal muscle strength, tone, and bulk during examinations.  (AR at 523, 950, 964, 1068, 1133, 1285, 1349, 1433.)  Straight-leg raise tests were typically negative, and she was noted to be able to abduct, adduct, flex, and extend at the hips without any difficulty.  (AR at 950, 1049, 1285, 1335.)  Examinations also typically revealed intact cranial nerves and reflexes.  (AR at 418, 520, 523, 732, 811,

1133.)  In addition, despite some instances of antalgic gait in the record, Buechner had a normal, steady gait at other times.  (AR at 523, 867, 870, 961, 1049, 1055, 1146, 1155, 1433.)  Relatedly, during her appointments, Buechner's treatment providers generally observed that she was in no acute distress.  (AR at 417, 426, 445, 449, 1055, 1155, 1201, 1243, 1260.)

State agency medical consultant Dr. William Fowler, M.D., found that Buechner could perform a reduced range of light work, including that she could stand and/or walk for a total of about six hours and sit for a total of about six hours in any eight hour work day.  (AR at 96-98.)  On reconsideration, state agency medical consultant Marcia Lipski, M.D., similarly concluded that Buechner could perform a reduced range of light work.  (AR at 147-48.)  Specifically, Dr. Lipski found that Buechner could stand and/or walk for a total of two hours and sit for a total of about six hours in an eight-hour workday, along with other exertional and environmental limitations.  (AR at 147-48.)

## C. Buechner's Function Reports and Hearing Testimony

In a function report completed on April 16, 2017, Buechner herself represented that:  she could not sit in one position for more than 5-10 minutes without increasing her back and leg pain; sitting continuously without getting up for more than 20-30 minutes increases the pain; and that on a good day, she could sit continuously for 45 minutes, but that is "an extreme limit."  (AR at 298.)  In that same report, Buchner's discussed her mental limitations, including that she: (1) has trouble hearing words correctly or saying words without mixing them up, and forgets words; (2) experiences wide mood swings; (3) has memory and comprehension problems, which prohibits her from staying current with

11

changes in the "web design/development" industry; (4) experiences problems with concentration; (5) has anxiety attacks; (6) can follow written and spoken instructions, although has difficulty comprehending complex instructions, especially if she is fatigued; and (7) has a very low stress tolerance.  (AR at 300-12.)

On March 29, 2019, Buechner appeared for a hearing before ALJ Victoria A. Ferrer, and testified further that she experienced memory and comprehension problems when working on a web design project in late 2014 and/or early 2015, at which point Buechner realized that she "was unable to be productive enough to complete what [she] needed to complete."  (AR at 39-40.)  In particular, according to Buechner, she lost her ability to keep up with web design in early 2016 when she was "reading something that was quite important, and not actually understanding how it connected with the different parts of the whole of web design and programming.  And since the progress is built on everything previous, if you stop being able to comprehend, you're gone.  You're lost."  (AR at 68.) Buchner also testified that she experienced anxiety when around other people in certain settings, such as when there are "angry voices" or "too many people in too small of an area," but not, for example, in a grocery story because she is able to "focus on what [she's] doing."  (AR at 42-43.)

### D. ALJ Opinion

On May 17, 2019, ALJ Ferrer issued a written decision denying Buechner's application.  (*See* AR at 15-27.)  Analyzing Buechner's alleged disability under the five-step sequential evaluation process set forth by the Social Security Administration (AR at 16), the ALJ concluded at step one that Buechner had not engaged in substantial gainful activity

since her alleged onset date of September 1, 2014.  (AR at 17.)  At step two, ALJ Ferrer concluded that Buechner had the following severe impairments:  "obesity, degenerative disc disease of the lumbar spine, neuropathy, osteoarthritis of the right ankle, and sleep-related hypoxemia."  (AR at 18.)  While the ALJ noted that Buechner had "major depressive disorder, generalized anxiety disorder, and somatic symptoms disorder," she also concluded that none of these impairments, whether considered singly or in combination, caused more than minimal limitations in Buechner's ability to perform basic mental work activities and were, therefore, nonsevere.  (AR at 18.)

Then, at step three, the ALJ concluded that none of Buechner's impairments met or equaled the severity of one of the listing-level impairments, and so proceeded to consider Buechner's residual functional capacity ("RFC").  (AR at 20.)  At step four, ALJ Ferrer concluded that Buechner had the RFC to perform sedentary work with certain exertional and environmental limitations.  (AR at 21.)  Specifically, the ALJ found that Buechner could "stand and/or walk about two hours in an eight-hour working day and sit about six hours in an eight-hour working day."  (AR at 21.)  At the same time, the ALJ included *no* mental limitations in Buechner's RFC.  (AR at 21.)  Finally, the ALJ found at step five that given Buechner's RFC, she was able to perform her past relevant work as a graphic designer. (AR at 26.)  As a result, the ALJ held that Baumann was not disabled within the meaning of the Social Security Act, and denied her application.  (AR 27.)

OPINION

Judicial review of a final decision by the Commissioner of Social Security is authorized by 42 U.S.C. § 405(g).  An ALJ's findings of fact are considered "conclusive,"

so long as they are supported by "substantial evidence." § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the Commissioner's findings, the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Plaintiff raises three arguments on appeal. First, plaintiff argues that the ALJ did not properly assess Buechner's mental impairments. Second, she argues that the ALJ did not properly assess Buechner's sitting limitations. Third, she argues generally that the "symptom evaluation is not supported by substantial evidence." (Pl.'s Br. (dkt. #13) 14.) The Commissioner counters that the ALJ's assessments are supported by substantial evidence and should be affirmed. The court addresses each argument separately below.

## I.  Mental Limitations

Plaintiff argues that the ALJ erred in concluding at step two of her analysis that Buechner's mental impairments were non-severe. (Pl.'s Br. (dkt. #13) 4-5.) Even if the ALJ did not err in assessing the severity of plaintiff's mental impairments, plaintiff further

argues that the ALJ erred by failing to address the impact of her non-severe mental impairments on her ability to perform the requirements of past work as part of the step four RFC analysis.  (*Id.* at 6.)  Because this court agrees that the ALJ erred in assessing Buechner's mental limitations at both step two and step four, remand is required.

Under the regulations, "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).  Social Security Ruling 85-28 further clarifies that "[a]n impairment or combination of impairments is found 'not severe' . . . when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."  Thus, a determination of severity at step two is "'a *de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities."  *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (quoting *Thomas v. Colvin*, 926 F.3d 953, 960 (7th Cir. 2016)).

Here, the ALJ acknowledged that Buechner had "medically determinable mental impairments of major depressive disorder, generalized anxiety disorder, and somatic systems disorder," but concluded that they were non-severe, both singly and in combination.  (AR at 18.)  In arriving at this conclusion, the ALJ noted Buechner's claims of greater limitations in her applications and at the hearing, but rejected them as overstated, citing primarily her own observations of Buechner during the hearing, Buechner's reports of activities of daily living, and notes from treatment providers as to her mental status being generally normal during specific appointments.  (AR at 18-19.)

15

Unfortunately, the ALJ's discussion excludes significant, relevant evidence.  As an initial matter, the ALJ fails to acknowledge the regular treatment Buechner sought and received for her depression and other mental impairments.   This treatment included frequent -- often monthly -- appointments with her PCP, therapist, and Nurse Sward to discuss behavioral and mental concerns.  With the support of her PCP, she also sought and received various referrals for specialists for psychological and neurological evaluations.  Finally, Buechner was prescribed medication to treat her depression.  This evidence is certainly relevant to the severity of Buechner's mental limitations, and its absence from discussion in the ALJ's step two analysis is odd all by itself.  *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir.2004) (physicians' prescription of strong pain medications substantiated claimant's pain allegations).

Even more telling, the ALJ neglected to discuss the results from Buechner's various mental evaluations.  While much of the findings were within a normal range, some also supported Buechner's claims of more severe mental health issues, particularly with regard to depression and its impact on the four broad areas of mental functioning set out in the Listing of Impairments.  20 C.F.R. 404(P) & App. A.  For example, Dr. Kanz noted Buechner's poor score on her BCSE cognitive screening inventory (AR at 834), and her processing speed index and memory for short story details were in the 18th and 14th percentiles, respectively (AR at 829).   Dr. Kanz also found Buechner to suffer from "significant depression" with symptoms that were "somewhat atypical in clinical populations." (AR at 830.)  Even Dr. Stepp -- who was generally more conservative in his assessment of Buechner's limitations and whose opinion the ALJ gave "great weight" at

step four -- concluded that Buechner's symptoms were consistent with a diagnosis of "major depressive disorder, recurrent episode, severe," "generalized anxiety disorder," and "somatic symptom disorder, moderate."  (AR at 410.)

In *O'Connor-Spinner*, the Seventh Circuit observed that an ALJ's conclusion that "'major depression, recurrent severe' isn't a severe impairment" was "nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational, or other important areas of functioning.'"  832 F.3d at 697 (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

Further, the ALJ failed to mention Buechner's frequent and consistent statements about her mental impairments to her providers over the course of multiple years.  Further, Buchner was frequently asked by both Dr. Haycraft-Williams and Nurse Sward to take the PHQ-9 self-assessment, which almost always indicated "moderately severe" levels of depression.   Similarly, the results of her GAD-7 self-assessments generally showed "moderate" levels of anxiety.  Buechner also regularly mentioned her depression, anxiety, and concerns about her memory, concentration, and cognitive functioning to her treatment providers, and proactively sought further treatment.

Of course, the weight of this evidence is mitigated by the fact that at least two clinicians observed Buechner's tendency to overreport her symptoms.  *See McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (evidence that claimant exaggerated her symptoms undercut her allegations of greater limitations).  Further, as noted by the ALJ, other affirmative evidence showed generally normal mental functions, including certain of

17

Buechner's daily activities, as well as her behavior in the hearing and at her medical appointments. Both forms of evidence were persuasive to the two state agency experts, Dr. Kleinman and Psychologist Lefevre, on whose opinions the ALJ gave "great weight" at step four.

Still, the ALJ failed to even discuss the substantial, contrary evidence identified above at step two. *See Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion."). Most glaring was the ALJ's failure to discuss at step two what would ordinarily be the controlling of plaintiff's two, primary mental health providers -- first, Dr. Haycraft-Williams, who treated her for depression, and later, Dr. Muminovic, who opined that her depression was debilitating. *See* SSR 96-2p (treating source medical opinions generally given controlling weight). The Social Security Administration has cautioned that "[g]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued." SSR 85-28. Since the ALJ here does not appear to have exercised requisite care in assessing the severity of Buechner's mental impairments at step two, her failure was error.

Not only was the ALJ's severity assessment at step two erroneous, but it was compounded at step four by assessing Buechner's functional limitations as completely unaffected by her mental impairments. Again, regardless of whether or not her mental limitations were found to be severe, the ALJ was required to consider all relevant evidence

18

in the record in assessing Buechner's RFC.  *See Murphy v. Colvin*, 759 F.3d 811, 817-18 (7th Cir. 2014) ("In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even [limitations] that are not severe.") (internal quotations omitted); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (ALJ must consider the effect of both non-severe and severe impairments in combination); SSR 96-8P ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").  "Mental limitations must be part of the RFC assessment, because '[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work.'"  *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (quoting 20 C.F.R. § 404.1545(c)).

Here, the ALJ's RFC analysis simply ignored entire lines of evidence that might support a functional mental limitation.  *Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 514 (7th Cir. 1999) ("[A]n ALJ may not ignore an entire line of evidence that is contrary to her findings.").  Specifically, the ALJ only discussed Buechner's mental impairments in the context of the opinion evidence.  Thus, she failed to acknowledge:  overall trends in the medical record, including Buechner's longstanding and frequent treatment for her depression and other mental concerns; the evidence of Buechner's consistent complaints to treatment providers of the limiting effects of her depression and cognitive problems; and Dr. Kanz's assessments, which indicated low scores in certain areas, including processing

speed index and memory, resulting in a diagnosis of "cognitive dysfunction, presumed secondary to emotional factors."  (AR at 829-34.)

These errors cannot be said to be harmless, especially in light of the skilled nature of plaintiff's past relevant work.  *See Alesia v. Astrue*, 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011) (ALJ's failure to include limitations based on claimant's mild depression necessitated remand given the skilled nature of her past relevant work).  Indeed, according to the Dictionary of Occupational Titles, Buechner's past job as a graphic designer requires a reasoning level of 5, meaning that she would be expected to:  (1) "[a]pply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions"; (2) "[i]nterpret an extensive variety of technical instructions in mathematical or diagrammatic form"; and (3) "[d]eal with several abstract and concrete variables." *Graphic Designer*, Dictionary of Occupational Titles Job No. 141.061-018, 1991 WL 647094.  Even mild mental limitations could preclude such work.  *See Yealey v. Berryhill,* No. 16-CV-418-SLC, 2017 WL 2628890, at *4 (W.D. Wis. June 19, 2017) ("It is particularly important to include [mental] limitations in the RFC when the ALJ considers a claimant's ability to perform past semi-skilled or skilled work, because even mild limitations may preclude such work.").  Finally, the VE testified at the hearing that Buechner would not be able to work as a graphic designer if, in addition to the physical limitations, she was "limited to simple, routine, and repetitive tasks," could "understand, remember, and carry out simple instructions," and "should avoid interactions with the public."  (AR at 81.)  Accordingly, remand is warranted for reconsideration of Buechner's

mental limitations.[5]

## II. Sitting Limitations

Although remand is required regardless, the court will briefly address plaintiff's other arguments, beginning with her assertion that the ALJ failed to assess Buechner's sitting limitations properly.  (Pl.'s Br. (dkt. #13) 10.)  According to plaintiff, the medical evidence "reasonably supports Ms. Buechner's alleged sitting restrictions."  (Pl.'s Br. (dkt. #13) 14.)  However, this court's task is not to assess whether the evidence "reasonably supports" plaintiff's position.   Instead, the court must determine whether the ALJ's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (1971).  Unlike her treatment of mental health limitations, the ALJ's decision regarding Buechner's sitting limitations meets this standard.

Plaintiff does not suggest that the ALJ failed to discuss the relevant evidence in the record.  On the contrary, she acknowledges that the ALJ summarized "some abnormal and some 'normal' evidence."  (Pl.'s Br. (dkt. #13) 13.)  Rather, plaintiff takes issue with the ALJ's decision to rely on the "'normal' findings" over the "abnormal" ones.  (*Id.*)  Such weighing of competing evidence is a normal, and indeed a necessary, part of the ALJ's decision-making process, and it is not to be second-guessed by a reviewing court.  *See Clifford*, 227 F.3d at 869 (reviewing court cannot "re-weigh the evidence . . . or otherwise

---

[5] In remanding, the court acknowledges that a finding of actual disability is not a foregone conclusion, especially in light of the conflicting evidence of record.  Rather, the court is only holding that, as set forth above, the ALJ cannot take short cuts at steps two and four to reach a preordained result, especially by ignoring strong evidence contrary to the findings at each of those steps.

substitute its own judgment for that of the ALJ" in reviewing the Commissioner's findings).

Plaintiff also suggests that the ALJ did not adequately *explain* her conclusion that Buechner could sit six hours each day. (Pl.'s Br. (dkt. #13) 13-14.) More specifically, plaintiff correctly points out that an ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p. Additionally, in this narrative discussion, an ALJ "must build a logical bridge from the evidence to his conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)).

However, the ALJ here discussed the evidence that supported Buechner's claim of disability, including: her allegations at the hearing and in her function report; her history of back pain, as well as pain, tingling, numbness in her legs; signs of tenderness on examination; treatment, including lumbar steroid injections; the April 2016 MRI results; and Dr. Muminovic's November 2017 opinion that Beuchner was unable to sit for long periods of time. (AR at 22-25.) The ALJ also discussed evidence that cut against Buechner's allegations, including that: she exhibited normal muscle strength, tone, and bulk; she had normal straight-leg and other leg flexibility and exertional tests; no treatment providers observed any acute distress; her generally normal activities of daily living; and the opinion evidence from the state agency physicians. (AR at 22-25.)

The ALJ then concluded that "[t]he totality of the afore-mentioned evidence" showed that Buechner could "perform sedentary work with reduced postural duties and exposure to workplace hazards." (AR at 23.) Moreover, her discussion cited specific

medical facts, as well as nonmedical evidence, and properly built a logical bridge between that evidence and her conclusion.  Therefore, the court finds no error with the ALJ's analysis as to Buechner's sitting limitations.[6]

## III. Other Arguments

Finally, plaintiff next argues generally that the ALJ's "symptom evaluation is not supported by substantial evidence" (Pl.'s Br. (dkt. #13) 14), including under this general heading various, specific criticisms regarding the ALJ's treatment of certain evidence, which the court addresses below.

### A. Activities of Daily Living

Plaintiff takes issue with the ALJ's consideration of Buechner's activities of daily living.  (Pl.'s Br. (dkt. #13) 14-15.)  As an initial matter, the regulations specifically *permit* an ALJ to consider a claimant's activities of daily living as a part of the disability assessment.  20 C.F.R. § 404.1529.  Plus, the Seventh Circuit has likewise explained that "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'"  *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)).  While it is true that an ALJ may "not to equate such activities with the rigorous demands of the workplace," *id.*, the ALJ here did not impermissibly equate these activities with an ability to work full time.  Instead, she

---

[6] Of course, the ALJ can again consider these limitations to the extent they may impact her mental health analysis or may have changed over time.

cited Buechner's activities as evidence undercutting her allegations of disabling symptoms. Accordingly, the ALJ's consideration of her activities of daily living was proper.

### B.  Medications/Treatment

Plaintiff also argues that the ALJ neither fully addressed Buechner's course of treatment nor the side effects from the medications she was taking.  (Pl.'s Br. (dkt. #13) 16-17.)  As a general proposition, in assessing a claimant's symptoms, an ALJ must consider a claimant's medication and any other treatment she has received.  *See* 20 C.F.R. § 404.1529.  Moreover, a treatment provider's prescription of strong medication or surgery, and a claimant's willingness to undergo such treatment, can corroborate allegations of disability.  *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014).

As discussed earlier, the court has already held that ALJ Ferrer did not adequately assess Buechner's mental limitations, including fully addressing her extensive treatment for emotional and cognitive concerns.  As for her physical impairments, however, the court finds no error.  The ALJ noted that Buechner received lumbar injunctions, used a brace for her right ankle, and used a cane.  (AR at 22.)  Plaintiff faults the ALJ for not (1) listing her "numerous" medications, (2) acknowledging that she tried aquatic therapy and a TENS unit, and (3) addressing her physical therapy.  (Pl.'s Br. (dkt. #13) 16.)  Without pointing to any objective medical evidence reflecting these side effects, she also argues that the ALJ should have considered her allegations of medication side-effects, relying only on Buechner's allegations.  (*Id.* at 17.)

While many social security claimants have a long list of prescribed medications, the court is not aware of any precedent holding that the ALJ is required to list every medication

taken by a claimant during the relevant period.  If anything, the case law is to the contrary. *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (ALJ is not required to discuss every piece of evidence in the record).  Regardless, plaintiff fails to explain how the ALJ's consideration of these medications and their side-effects would have changed the RFC assessment.  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").

## C. Somatic Symptom Disorder

Plaintiff next argues that the ALJ failed to consider fully the effect of Buechner's psychological impairments on her physical limitations.  (Pl.'s Br. (dkt. #13) 17-18.)  In particular, Buechner was diagnosed with somatic symptom disorder, and her medical records outline above contains various notes indicating that this psychological condition could contribute to her perception of physical pain.  The Seventh Circuit has explained that:

> Pain is always subjective in the sense of being experienced in the brain. The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second.

*Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (citing *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir.1995); *Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994); *Easter v. Bowen*, 867 F.2d 1128, 1129 (8th Cir. 1989)).  Moreover, the regulations require an ALJ to consider the combined impact of a claimant's impairments throughout the disability determination process.  20 C.F.R. § 404.1423(c).

25

Here, ALJ Furrer actually found that Buechner had a somatic symptom disorder (AR at 18), yet thereafter failed to mention the disorder or otherwise consider how her psychological conditions interacted with her complaints of pain and other physical limitations.  In fairness, many of the notes connecting Buechner's psychological issues to physical limitations are somewhat speculative (e.g. noting that her depression "could" exacerbate her perception of pain), but again, having credited Buechner's somatic symptom disorder (even if "nonsevere"), the ALJ's failure to even acknowledge, much less address, these records or the possible combined effect of Buechner's psychological and physical impairments was error.

## D. Nurse Sward's Opinion

Finally, plaintiff argues that the ALJ erred in considering Nurse Sward's statement that Buechner would benefit from working.  (Pl.'s Br. (dkt. #13) 18-19.)  The ALJ labeled this statement a medical opinion and assigned it "great weight."  (AR at 25.)  According to plaintiff, however, this statement was not a medical opinion under the regulations, and therefore, it was improperly considered.  Nurse Sward's specific observation at issue states: "[Buechner] would benefit from having employment.  She is very focused on finding reasons why she cannot work instead of figuring how she can work."  (AR at 1129.)

The regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(1). The court agrees with plaintiff that Nurse Sward's observation does not reflect a judgment

26

"about the nature and severity" of Buechner's impairments, and so should not have been treated as a medical opinion under the regulations, much less given great weight. In particular, Nurse Sward's conclusion that Buechner would benefit from work does not logically imply that she is *capable* of full-time, substantial gainful employment.

Of course, the ALJ could still *consider* Nurse Sward's observation, along with others' comments about possible malingering and findings of normal mental functioning. It is the elevating of the observation to a medical opinion, and then assigning it great weight, that is the error. However, the court need not decide whether this error alone would necessarily warrant remand, since the court found non-harmless error with respect to the larger issue of plaintiff's mental limitations. Still, on remand, the Commissioner is directed to reconsider both the nature of and weight assigned Nurse Sward's observations.

## ORDER

IT IS ORDERED that the decision of defendant Andrew M. Saul, Commissioner of Social Security, denying plaintiff Catherine Margaret Buechner's application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 9th day of February, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

27